CRYSTAL M. SHROYER, on behalf of )
herself and her minor children J.S. and S.S, )
)
    Plaintiffs, )
)
       v. )     Civil No.: 1:10-CV-211-TLS
)
UNITED STATES OF AMERICA )
(Bureau of Alcohol, Tobacco, Firearms and, )
Explosives), CITY OF FORT WAYNE, JOEL C. )
SQUADRITO (Sergeant), ERIC M. THOMPSON )
(Officer), GREGORY L. STIER (Sergeant) )
and MATTHEW HARRISON (Detective) )
(Fort Wayne Police Officers sued in their )
individual capacities), )
)
    Defendants. )

## OPINION AND ORDER

The Plaintiff, Crystal M. Shroyer, on behalf of herself and her minor children, J.S. and

S.S., has sued the United States of America, the City of Fort Wayne, and individual officers of

the Fort Wayne Police Department (FWPD). She claims that on May 1, 2009, agents from the

Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) and officers from the FWPD

surrounded her home and seized her in violation of the Fourth Amendment to the United States

Constitution and the tort laws of the State of Indiana. The Defendants have moved for summary

judgment.

## BACKGROUND

The Plaintiff initiated this lawsuit on June 28, 2010, and filed a First Amended Complaint

on December 27, 2010. The Plaintiff has sued the United States of America in its representative

capacity for the actions of its agents, which she alleges violated the tort laws of the state of Indiana. The three ATF officers that the Plaintiff sued in their individual capacities, ATF Special Agent (SA) Sean T. Skender, Task Force Officer (TFO) Miguel G. Rivera, and TFO Michael C. Tapp, were previously dismissed for insufficient service of process. The Amended Complaint also names the City of Fort Wayne and several FWPD officers in their individual capacities: Sergeant Joel C. Squadrito; Officer Eric M. Thompson; Sergeant Gregory L. Stier; and Detective Matthew Harrison. The Plaintiff alleges that these individual officers are liable to her under 42 U.S.C. § 1983 for participating in an unlawful seizure in violation of the Fourth Amendment. She alleges that the City of Fort Wayne is liable under Indiana law for the torts of its police officers.

On March 2, 2012, the United States of America filed its Motion for Summary Judgment [ECF No. 61] and Memorandum in Support [ECF No. 62], with attached exhibits. Defendants Squadrito, Stier, Harrison, Thompson, and the City of Fort Wayne also moved for summary judgment [ECF No. 63] and filed a Memorandum in Support [ECF No. 64]. The Plaintiff filed a Response in Opposition [ECF No. 65] and Answer Brief [ECF No. 66]. Both the United States and the Fort Wayne Defendants filed a Reply [ECF Nos. 71, 72]. The Fort Wayne Defendants also filed a Supplemental Designation of Evidence [ECF No. 73]. In response to this supplemental evidence and the Defendants' reply briefs in support of summary judgment, the Plaintiff filed a Sur-Response [ECF No. 78].

## MATERIAL FACTS

Steven Shroyer is the Plaintiff's husband. In May 2008, the ATF began an investigation

focused on Mr. Shroyer's suspected illegal activities. On March 23, 2009, ATF agents arrested Mr. Shroyer on charges related to firearms and narcotics. In addition, members of law enforcement believed that he was a participant in the white supremacist movement. On Thursday, April 30, one such officer, FWPD Officer Frederick Ray, spoke to Mr. Shroyer while he was detained at the jail. According to Officer Ray, Mr. Shroyer told him that "his people" had six cases of C-4 military explosives,[1] and that there were a large number of skin heads in Fort Wayne who were armed and would not hesitate to shoot law enforcement officers. When Officer Ray referenced the recent influx of skin heads, Mr. Shroyer stated that things were going to get crazy. He told Officer Ray to talk to his wife, Crystal, for more specific details.

After finishing his conversation with Mr. Shroyer, Officer Ray went to the Shroyer house, which is located in a residential area of Fort Wayne, to speak to the Plaintiff about the white supremacist movement in the Fort Wayne area and the report of C-4 explosives. Officer Ray contends that the Plaintiff and three young men with shaved heads came to the door. Officer Ray told the Plaintiff that he had talked to her husband. She did not provide him any information in response to questions about the local white supremacist movement but, according to Officer Ray, nodded her head in an affirmative motion when he mentioned C-4 explosives.

---

[1] C-4 or Composition 4 is a plastic explosive in which four different explosive chemicals are combined with plastic binder material. It can be easily molded into any shape, and it is very stable and insensitive to most physical shocks. C-4 can only be detonated using a combination of extreme heat and a shockwave, such as when a detonator or blasting cap inserted into it is fired. When the chemical reaction of an explosion begins, the C-4 decomposes to release a variety of gases that expand at about 26,400 feet per second, applying a huge amount of force to everything in the surrounding area. *See* http://en.wikipedia.org/wili/C-4_(explosive); http://science.howstuffworks.com/c-42.htm (both websites visited on Oct. 18, 2012).

The Plaintiff remembers that Officer Ray talked to her about a gang coming to town, but maintains that he did not say anything about explosives. (C. Shroyer Dep. 106, ECF No. 65-1 at 12.) Mr. Shroyer also denies that he said anything about having C-4 explosives to Officer Ray. (S. Shroyer Dep. 4, ECF No. 65-5 at 1.)

Officer Ray relayed his conversations with the Shroyers to Detective Harris who, in turn, told SA Skender. SA Skender was already familiar with Mr. Shroyer from the ATF investigation that preceded his arrest. On July 3, 2008, during the course of the ATF investigation, SA Skender was listening to a conversation between Mr. Shroyer, an undercover ATF agent, and a confidential informant when he heard Mr. Shroyer say that he was trying to obtain some C-4 explosives. SA Skender had also personally observed tattoos on Mr. Shroyer, a swastika and SS bolts, which he believed suggested affiliation with a white power movement. Detective Harris told SA Skender that when Officer Ray attempted to talk to the Plaintiff, the three men remained at the door and she was hesitant to speak. SA Skender contacted Sergeant Stier, the Hazardous Devices Unit Supervisor for the Fort Wayne Police Department, and briefed him on the situation. They determined that it was important to contact the Plaintiff about the C-4 and perhaps search the residence to eliminate the potential safety threat to her and the other residents in the area. SA Skender requested that Fort Wayne police officers serve as back-up for a "knock and talk" with the Plaintiff at her home.[2] On Friday, May 1, SA Skender, TFO Rivera, and TFO Tapp went to the Shroyers' residence on behalf of the ATF. Officer Thompson, Detective Harris, and Sergeant Squadrito provided back-up by assisting in securing a perimeter around the Plaintiff's house.

---

[2] There is no indication in the record whether the Defendants considered applying for a search warrant. It is undisputed that the Defendants did not have a warrant when they went to the Shroyer house.

4

Sergeant Stier was also present.

Between 9:30PM and 10:00PM, the officers approached the house and situated themselves on three sides. TFO Tapp and Officer Thompson were carrying long guns in the low ready position. Another agent was in the front of the house on the far side of the sidewalk behind a tree with his firearm pointed toward the ground. SA Skender and Sergeant Squadrito approached the front door with their guns holstered. Inside the house were the Plaintiff and her two children, William Martin, Jessica Brown (Martin's girlfriend), Andrew Snyder (the Plaintiff's brother), Felicia Sthrol (the Plaintiff's cousin) and Danielle Campbell, a friend who also had her elementary age daughter with her. Another friend's young daughter was also visiting at the time. The Plaintiff's brother was the first to notice the officers outside, and exclaimed that there was a guy outside pointing a gun at the window of the room where the kids were playing. Martin went to the front door and spoke briefly with the officers, who requested to speak with the Plaintiff. Martin called for the Plaintiff to come outside because there were cops at the door for her, and the Plaintiff went out on the front porch to talk to SA Skender.

SA Skender identified himself to the Plaintiff and advised that he was there because the ATF and FWPD had information that the house possibly contained some explosives, C-4, and he wanted to come in, find it, and remove it for safety concerns. The Plaintiff denied there was any C-4 in the house and said that the officers could not come in without a warrant. Over the course of the next hour,[3] the officers stayed outside the residence attempting to gain the Plaintiff's

_____

[3] There exists a dispute regarding how long the Defendants were at the house. The most conservative estimate is 45 minutes to 1 hour. The Plaintiff states that the Defendants arrived at 9:30PM, the Defendants pinpoint their arrival at around 10:00PM. Many of the occupants of the house estimate the time the Defendants stayed between 1½ to 2 hours, but one of the officers was in route to another scene by 10:50 PM, and all the Defendants left at the same time.

consent to search the home. At least five different law enforcement officers spoke to the Plaintiff. The parties tell differing versions of what transpired during the time, specifically as it relates to what the officers said. All the parties agree that the Plaintiff walked around outside smoking a cigarette while officers continued to talk to her about getting permission to look for C-4. The other adults who had been inside the house came outside and were sitting on the front porch. Martin claims that an officer instructed all the adults to come outside. While on the porch, Campbell expressed to the Plaintiff what she knew about warrants and legal rights, and one of the officers threatened to take her to jail for obstructing the investigation. (Campbell Dep. 22, ECF No. 65-2 at 5.) The Plaintiff testified that some of the officers threatened that they would be "back with flash bombs to throw in the house" and run them out so the officers could gain access, that it was going to be "headline news with Washington D.C. and the FBI and everybody was going to be involved." (C. Shroyer Dep. 127, ECF No. 65-1 at 17.) One of the officers at the back of the house warned that if the Plaintiff's dog (a large bulldog) was not controlled, he would shoot the dog. SA Skender, while trying to convince the Plaintiff to let him find the C-4, spoke in derogatory terms about the Plaintiff's husband within hearing of her children. Martin, who was still a teenager, left the porch to talk to his mother, who had pulled up in a car. The officers asked him to empty his pockets and patted him down. Martin's mother told an officer that she wanted to take Martin home, but the officer said that Martin could not leave at that time because of the ongoing investigation.

SA Skender maintains that he told the Plaintiff that he could get a federal search warrant. When the Plaintiff said that she didn't care, he advised her that if a search warrant was executed and explosives were found in the residence, then Child Protective Services (CPS) would get

involved. According to the Plaintiff, SA Skender simply told her that he was going to call CPS to take her children away, and she was afraid the officers would get CPS to come to her house that night to take her kids, even though she had done nothing wrong. Acting on this concern, the Plaintiff told her cousin, Felicia, to take the kids from the house and walk them down the sidewalk to stay at another relative's house. Jessica Brown also left with them.

The Plaintiff told SA Skender that he could come look inside the house after her cousin left with her kids. (C. Shroyer Dep. 54.) However, when SA Skender asked the Plaintiff to sign a consent to search form, she suspected that the Defendants did not have a legal right to search her home if she continued to refuse. The Plaintiff then went inside the house and called a friend who advised her not to let the police in her house without a warrant and not to sign anything. When the Plaintiff again told SA Skender that he needed a warrant, the situation escalated with both parties raising their voices. According to the Plaintiff, SA Skender was close enough to the Plaintiff that she felt his saliva spray on her face as he yelled at her. SA Skender told the Plaintiff that she was "pissing him off" and walked away. Other officers then tried to talk to the Plaintiff about letting them in the house to search for the explosives. The Plaintiff went back inside the house for about thirty minutes to clear and wash the dinner dishes while the other adults stayed on the porch. During this time, the officers asked the Plaintiff's brother to go in the house to convince the Plaintiff to get her to come back outside, but she refused. When she was finished with the dishes, the Plaintiff went back outside and SA Skender gave her his card and all the officers left. SA Skender states in his Affidavit that Sergeant Squadrito, Sergeant Stier, TFO Rivera, and Detective Harrison all attempted to speak to the Plaintiff "but did not get anywhere with her," and that "[a]s the night went on [the Plaintiff] was becoming more upset and agitated,

therefore [he] requested everyone leave the residence." (Skender Aff. 7, ECF No. 62-1.)


**ANALYSIS**

Summary judgment is appropriate if the facts supported by materials in the record show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The motion should be granted so long as no rational fact finder could return a verdict in favor of the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson,* 477 U.S. at 249–50; *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994); *see also Waldridge v. Am. Hooechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994) ("[B]ecause summary judgment is not a paper trial, the district court's role in deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial.").


**A.      Fourth Amendment**

To prevail on a § 1983 claim, a plaintiff must show that she was deprived of a right secured by the Constitution or laws of the United States and that the deprivation was caused by a person acting under color of state law. *Reynolds v. Jamison*, 488 F.3d 756, 764 (7th Cir. 2007). The Plaintiff claims that she was unlawfully seized in violation of the Fourth Amendment. The

Defendants maintain that they are entitled to qualified immunity against the Plaintiff's Fourth Amendment claim. They submit that the Fourth Amendment was not implicated by their actions because they did not seize the Plaintiff when they executed a lawful "knock and talk." The Defendants assert that, even if the knock and talk amounted to a seizure under the Fourth Amendment, the seizure would have been justified because the officers had reasonable suspicion supported by articulable facts that criminal activity was taking place inside the house. Specifically, that it is illegal to possess C-4 in a residence or for a convicted felon, like Steven Shroyer, to possess the explosive. The Defendants further contend that, even assuming a Fourth Amendment violation did occur, it would not have been clear to a reasonable officer that his conduct was unlawful in the situation presented outside the Plaintiff's home on May 1, 2009.

Governmental actors performing discretionary functions enjoy qualified immunity and are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Sallenger v. Oakes*, 473 F.3d 731, 739 (7th Cir. 2007) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

> The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct. It is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts. An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances. If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense.

*Saucier v. Katz*, 533 U.S. 194 (2001). There is a two-part test for qualified immunity: "(1) whether the facts, taken in the light most favorable to the plaintiff, show that the defendants violated a constitutional right; and (2) whether that constitutional right was clearly established at

the time of the alleged violation." *McComas v. Brickley*, 673 F.3d 722, 725 (7th Cir. 2012).

These questions may be addressed in whichever order best suits the circumstances of the case.

*Id.*; *McAllister v. Price*, 615 F.3d 877, 881 (7th Cir. 2010).

1.      A Reasonable Jury Could Find that the Officers Seized the Plaintiff in Violation of the Fourth Amendment

Viewing the facts in the light most favorable to the Plaintiff, as is required at this stage of the proceedings, a reasonable jury could find that the Defendants seized the Plaintiff in violation of the Fourth Amendment.

The Fourth Amendment protects the right of "the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. However, not all encounters between the police and citizens implicate the Fourth Amendment's prohibition against unreasonable searches and seizures. *United States v. Scheets*, 188 F.3d 829, 836 (7th Cir. 1999). The Defendants argue that they did not need probable cause to approach the Plaintiff's residence and ask to speak with her. The technique they used, commonly called a "knock and talk," occurs when officers approach a residence where they suspect illegal activity is occurring, knock on the door, and attempt to gain consent to enter. *United States v. Adeyeye*, 359 F.3d 457, 461 (7th Cir. 2004); *see also Hayes v. State*, 794 N.E.2d 492, 496 (Ind. Ct. App. 2003) ("A knock and talk investigation 'involves officers knocking on the door of a house, identifying themselves as officers, asking to talk to the occupant about a criminal complaint, and eventually requesting permission to search the house.'") (quoting *State v. Reinier*, 628 N.W.2d 460, 466 (Iowa 2001)). This is a permissible police procedure that does not require probable cause or even reasonable suspicion because it is not a seizure. *Adeyeye*, 359 F.3d at 461; *see also*

*United States v. Johnson*, 170 F.3d 708, 711 (7th Cir. 1999) (discussing knock and talk technique); *United States v. Jerez*, 108 F.3d 684, 691–92 (7th Cir. 1997) (discussing permissibility of knock and announce technique and its limitations); *United States v. Hardeman*, 346 F. Supp. 2d 770, 777 (E.D. Mich. 1999) (describing the knock and talk tactic as a strategy that is generally upheld as a legitimate method of investigation designed to obtain a suspect's consent to search).

The designated evidence supports the Defendants' argument that they initiated contact with the Plaintiff outside her house in an attempt to gain her consent to search her house for explosives, and that her initial interaction with the Defendant was voluntary and consensual. However, a consensual encounter can turn into a seizure. In *United States v. Mendenhall*, the Supreme Court stated the test for a seizure as follows: "[a] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." 446 U.S. 544, 554 (1980). But here, there is no evidence that the Plaintiff had any plans or desire to leave her residence on the evening of May 1, 2009, after she finished having dinner with family and friends. In circumstances where the person has no desire to leave the scene of an encounter with police, "the degree to which a reasonable person would feel he or she could leave is not an accurate measure of the coercive effect of the encounter" for purposes of applying the objective test of coercion. *Florida v. Bostick*, 501 U.S. 429, 435–36 (1991). Rather, "the appropriate inquiry is whether a reasonable person would feel free to decline the officer's request or otherwise terminate the encounter." *Id.* "A seizure of the person within the meaning of the Fourth and Fourteenth Amendments occurs when, taking into account all of the circumstances

surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Kaupp v. Texas*, 538 U.S. 626, 629 (2003) (quoting *Bostick*, 501 U.S. at 437 and *Michigan v. Chesternut*, 486 U.S. 567, 569 (1988) (internal quotation marks omitted)); *see also Adeyeye*, 359 F.3d at 461 (holding that there is no seizure of a person who is approached by law enforcement in a place from which they have no desire to leave unless a reasonable person would not have felt free to decline the officers' request or otherwise terminate the encounter). In such circumstances, factors that might indicate a seizure include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Kaupp*, 538 U.S. at 630 (quoting *Mendenhall*, 446 U.S. at 554). This objective test, however, is only a threshold requirement for finding a seizure. A plaintiff must "actually yield to a show of authority from the police or be physically touched by the police." *California v. Hodari D.*, 499 U.S. 621, 625–26 (1991) (holding that a subject was not seized when he fled from a pursuing officer until he was tackled by the officer).

Considering the evidence in a light most favorable to the Plaintiff and crediting her version of events, the tactics employed by the Defendants would cause a reasonable person to believe that she could not ignore their presence, and that compliance with their demands was compelled. The coercive and intimidating behavior included the presence of seven law enforcement officers around the front, side, and back of the house, a displayed firearm near the front window and the back of the house, a raised and agitated tone of voice, calling the Plaintiff's husband derogatory names, stating that CPS was getting involved to take the

Plaintiff's children, threatening that the FBI would return with flash bangs to run the occupants out of the house, and a warning to put her dog in a secure place or police would shoot him. Although the Defendants argue that a reasonable person would feel free to decline the officers' request or otherwise terminate the encounter, the factual scenario they present in support of this argument does not include the Plaintiff's most serious assertions about their behavior. The conflicting versions of the events of May 1 create a triable issue regarding the level of police coercion involved and whether a reasonable person would have felt free to decline the Defendants' requests or otherwise terminate the encounter.

In support of their assertion that the Plaintiff was not seized by their actions because she did not actually yield to their authority, the Defendants place considerable emphasis on the fact that the Plaintiff did not consent to a search for C-4. A search, however, is distinguishable from a seizure and the Plaintiff has made no allegation that the Defendants subjected her person or her home to an unlawful search. *See Christensen v. Cnty. of Boone*, 483 F.3d 454, 459 (2007) ("A search takes place when the state intrudes upon an individual's legitimate interest in privacy." (citing *Katz v. United States*, 389 U.S. 347 (1967))). The relevant question is whether she yielded to the show of authority in the context of a seizure. The designated evidence shows that she did. The Plaintiff not only answered the door, but left her house to engage in conversation with the officers who were trying to convince her to let them search her residence. In addition, she arranged for her children to be taken out of the house where they had intended to spend the night and brought to a relative's house instead. In consideration of whether to consent to a search, she made a telephone call to a friend for advice and then communicated her decision to the Defendants. The Plaintiff submitted to the Defendants' show of authority when she adjusted her

behavior to respond to the presence of the officers. *See, e.g., Brendlin v. California*, 551 U.S. 249, 262 (2007) (explaining that "what may amount to submission depends on what a person was doing before the show of authority: a fleeing man is not seized until he is physically overpowered, but one sitting in a chair may submit to authority by not getting up to run away").

The Seventh Circuit's decision in *United States v. Jerez*, 108 F.3d 684 (7th Cir. 1997), provides guidance for this case. *Jerez* involved a night time encounter at a motel. Police knocked on the door of the motel room for three minutes. They knocked on the window for an additional one and one-half minutes, all without producing an answer from its occupants. The police then shone a flashlight through a small opening in window drapes onto one of the occupants as he lay on a bed, and commanded "Police, Open the door." The court concluded that, based on the totality of circumstances surrounding the encounter, the motel occupants were seized. The court distinguished those cases in which occupants voluntarily opened the door after a daytime knock and engaged in a consensual encounter. "Once the officers had been refused admittance, their continued efforts to rouse the occupants out of bed certainly prevented them from ignoring the continued requests and from maintaining the privacy and solitude of their dwelling. The deputies' persistence, in the face of the refusal to admit, transformed what began as an attempt to engage in a consensual encounter into an investigatory stop." *Jerez*, 108 F.3d at 691–92. The law enforcement officers refused to take "no" for an answer and a "reasonable person in [the plaintiffs'] situation could conclude only that the deputies would not leave unless the door was opened." *Id.* at 692–93. The court further found that when the occupant opened the door, he submitted to the officers' show of authority. *Id.* at 692.

Here, the Plaintiff's brother immediately responded to knocking at the front door, spoke

to the officer at the door, and retrieved the Plaintiff, who came to the door. Under these circumstances, the Plaintiff cannot claim that she was seized when she voluntarily went to the door to speak to the officers. However, the prolonged presence of seven law enforcement officers after the Plaintiff repeatedly expressed that she was not going to voluntarily allow the officer into her home suggests that they refused to take no for an answer and would not leave her alone unless she agreed to engage them in further conversation about searching her home for explosives, which she did. When she did attempt to ignore the police by going inside her house to do dishes for half an hour, the Defendants did not leave until after they had talked to the other occupants in an attempt to get them to convince the Plaintiff to change her mind. According to the Plaintiff's designated evidence, various officers tried different tactics, including threatening to get the FBI involved and to come back with flash bangs, calling her husband names, assuring her that the officers were only interested in finding explosives, and stating that CPS would remove her children. When one of the occupants expressed a desire to leave with his mother, who was waiting outside in a car, an officer told him he could not leave yet because of the investigation. All of these factors, which demonstrated the officers' persistence, are relevant to whether a reasonable person would believe that it was within their power to terminate the encounter.

The Defendants' conduct, even if it amounted to a seizure, would nonetheless be justified as an investigatory detention if the officers had reasonable suspicion supported by articulable facts that criminal activity was taking place, *see Terry v. Ohio*, 392 U.S. 1 (1968), and the detention remained "reasonably related in scope to the circumstances which justified the interference in the first place," *id.*, 392 U.S. at 20. The Defendants argue that the federal agents

had gathered sufficient facts to support a reasonable suspicion that C-4, which was illegal to possess inside a residence, was being stored at the Shroyers' residence. The Plaintiff's designated evidence, however, raises disputes regarding several important facts that the Defendants rely upon to justify their suspicions. Mr. Shroyer contends that he did not talk to Officer Ray about C-4, and the Plaintiff likewise maintains that she did not hear anything about C-4 until May 1, 2009. At this stage of the proceedings, the Court does not vouch for the truth of the facts, *Herzog v. Village of Winnetka*, 309 F.3d 1041, 1044–45 (7th Cir. 2002), but merely uses them to determine whether the case can be resolved as a matter of law, *see Stokes v. Bd. of Educ. of the City of Chi.*, 599 F.3d 617, 619 (7th Cir. 2010) (noting that the court cannot "assess the credibility of witnesses, choose between competing reasonable inferences, or balance the relative weight of conflicting evidence," and "must view all the evidence in the record in the light reasonably most favorable to the nonmoving parties"). Without these discussions about C-4, the Court cannot find, as a matter of law, that the Defendants actions were justified as an investigatory detention. Moreover, in light of the other factual disputes regarding the conduct of the Defendants during the encounter, the Court cannot resolve whether any investigatory detention that was justified at its inception remained reasonably related in scope to the circumstances that first justified the detention. Such issues are for a jury to decide.

2.      The Constitutional Right was Clearly Established

For a constitutional right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right"; however, an official action is not protected by qualified immunity only when the very action in question has

previously been held unlawful, rather the unlawfulness must be apparent "in light of the pre-existing law." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002); *see also Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 528 (7th Cir. 2012) (noting that "a case directly on point is not required for a right to be clearly established and 'officials can still be on notice that their conduct violates established law even in novel factual circumstances.'" (quoting *Hope*, 536 U.S. at 741)). The court looks first to controlling precedent on the issue from the Supreme Court and from this circuit. *Phillips*, 678 F.3d at 528. "If such precedent is lacking, [the court] look[s] to all relevant case law to determine 'whether there was such a clear trend in the case law that we can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time.'" *Id.* (quoting *Estate of Escobedo v. Bender*, 600 F.3d 770, 781 (7th Cir. 2010)).

To carry her burden of proving that the constitutional right she claims the Defendants violated was clearly established, the Plaintiff must either "(1) present case law that has articulated both the right at issue and applied it to a factual circumstance similar to the one at hand or (2) demonstrate that the 'contours of the right are so established as to make the unconstitutionality obvious.'" *Ault v. Speicher*, 634 F.3d 942, 946 (7th Cir. 2011) (quoting *Boyd v. Owen*, 481 F.3d 520, 526–27 (7th Cir. 2007)). The Court finds that controlling precedent would have put a reasonable officer on notice that the Defendants' May 1, 2009, show of authority crossed the line from a consensual encounter to a Fourth Amendment seizure. In particular, cases like *United States v. Mendenhall*, 446 U.S. 544 (1980), *Florida v. Bostick*, 501 U.S. 429 (1991), and *Kaupp v. Texas*, 538 U.S. 626 (2003), would have put the Defendants on notice that their actions—which the Court assumes at this point in the proceedings included the presence of seven officers around the perimeter of the house, drawn firearms, repeated requests

to enter the home, statements that CPS would take the Plaintiff's children, threats to return with flash bang devices, derogatory references to the Plaintiff's husband, a warning to put away the dog or risk that police would shoot it, and the refusal to let one of the occupants leave because officers were still investigating—would cause a reasonable person to believe that he was not at liberty to ignore the police presence and thus constituted a seizure of the person within the meaning of the Fourth Amendment. The Seventh Circuit's decision in *United States v. Jerez*, 108 F.3d 684 (7th Cir. 1997), lends further clarity as it involved a situation where law enforcement's persistence in the face of a refusal transformed what began as an attempt to engage in a consensual encounter into an investigatory seizure.

Knowing that they did not have a warrant, the Defendants were obligated in their dealings with the Plaintiff to anticipate that their knock and talk would not produce the desire result—consent to search the house—and to then exercise the legal restraints that were clearly established as applicable to the circumstances so that their conduct would not produce an unreasonable seizure under the Fourth Amendment. Additionally, assuming the veracity of the facts designated by the Plaintiff, reasonable officers would know that there were not sufficient facts to support a reasonable suspicion that C-4 was located inside the residence.

**B.    False Imprisonment**

The Plaintiff claims that the United States of America is liable to her for the false imprisonment caused by the ATF agents on May 1, 2009.[4] The Plaintiff lodges this same claim

---

[4] None of the individual federal agents are remaining as defendants in this action. Because the federal government has not waived its sovereign immunity for constitutional torts, the Plaintiff cannot pursue a Fourth Amendment claim against it. *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 410 (1971) (Harlan, J., concurring) ("However desirable a direct remedy against

against the City of Fort Wayne.

Although false arrest and false imprisonment are claims that Indiana courts treat interchangeably, they are distinct causes of action when there has been no arrest made under the pretense of legal authority. *See Row v. Holt*, 834 N.E.2d 1074, 1088–89 (Ind. Ct. App. 2005), *vacated*, 864 N.E.2d 1011 (Ind. 2007) (citing *Dietz v. Finlay Fine Jewelry Corp.*, 754 N.E.2d 958, 967–68 (Ind. Ct. App. 2001)). "False imprisonment is the unlawful restraint upon one's freedom of movement or the deprivation of one's liberty without consent." *Miller v. City of Anderson*, 777 N.E.2d 1100, 1104 (Ind. Ct. App. 2002) (citing *Dietz*, 754 N.E.2d at 967). "False imprisonment may be committed by words alone, or by acts alone, or by both and by merely operating on the will of the individual, or by personal violence, or both." *Dietz*, 754 N.E.2d at 967 (quoting 35 C.J.S. *False Imprisonment* § 14, at 444 (1999)). Indiana law also recognizes that an "originally reasonable detention may be denied statutory protection if the actions taken in connection with the detention become unreasonable." *Id.* at 968.

The Defendant argues that the Defendant was not seized or detained because she "went about her business doing what she wanted without requesting permission from the police officers." (United States Mem. 17, ECF No. 62.) As proof of this, the Defendant notes that she walked around outside for 20 to 30 minutes smoking a cigarette shortly after the police arrived, gathered her children and escorted them out of the house when SA Skender mentioned CPS, refused to sign a consent to search after calling a friend, and washed her dishes for 30 minutes. As mentioned above, the fact that the Plaintiff did not acquiesce to the search is not proof that

---

the Government might be as a substitute for individual official liability, the sovereign still remains immune to suit."). The Plaintiff's claim against the United States is for the nonconstitutional tort of false imprisonment.

she did not yield to their show of authority or was able to terminate the encounter. Likewise, it is not proof that she did not suffer a deprivation of liberty. While she smoked a cigarette for 20 to 30 minutes, she did so while listening to the police try to convince her to let them inside her home. Her act of removing her children from her home was not "doing what she wanted," but was a direct response to the threat that CPS was coming. Although the Plaintiff went inside her house and washed dishes for 30 minutes, which was an obvious attempt to communicate that she was not interested in talking to the Defendants any further and wanted them to leave, the encounter still did not end. Rather, the police remained on the premises to talk to the Plaintiff's friends and brother to have them convince the Plaintiff to let them inside the house without a warrant. Because the designated evidence does not conclusively establish the reasonableness of the detention, it will be for a trier of fact to determine if the Plaintiff has established that the United States or the City of Fort Wayne is liable to her because agents and officers committed the tort of false imprisonment.[5]

The United States asserts that, if the Plaintiff was detained, she was not detained unlawfully because the agents possessed sufficient information to formulate a reasonable suspicion that C-4 might be stored at the Plaintiff's residence. The facts the United States relies on in support of this reasonable suspicion, however, are disputed. Accordingly, a triable issue of fact remains.

---

[5] As noted by the United States, any action against it under 28 U.S.C. § 1346 "shall be tried by the court without a jury." 28 U.S.C. § 2402. Under Federal Rule of Civil Procedure 39(c), which governs requests for jury trials in cases in which the parties are not entitled to a jury trial as of right, the court may try any issue with an advisory jury, but it will not have the same effect as if a jury trial had been a matter of right.

**C.     Punitive Damages**

The Plaintiff seeks punitive damages against the individually named officers of the FWPD. (First Am. Compl. 5, ECF No. 38.) Punitive damages may be awarded to "deter or punish malicious deprivations of rights." *Carey v. Piphus*, 435 U.S. 247, 266 (1978). "[A] jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). The court "presume[s] that the 'plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant imposition of further sanctions to achieve punishment or deterrence.'" *Estate of Moreland v. Dieter*, 395 F.3d 747, 757 (7th Cir. 2005) (quoting *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003)).

The Defendants argue that there is no evidence that the Fort Wayne police officers' alleged conduct was motivated by evil motive or intent, or that their alleged conduct involved reckless or callous indifference to the Plaintiff's federally protected rights, and summary judgment should be granted on the issue of punitive damages. (Mem. of Law 16, ECF No. 64.) The Plaintiff argues that the Defendants acted in reckless indifference to her federally protected rights when they "attempted to exhort a [warrantless] search by approaching the home with weapons, yelling and spitting into Plaintiff's face, threatening to kill her dog, threatening to take away her children, and threatening to flash-bang grenade her home." (Pl.'s Answer Brief 18, ECF No. 66.)

Considering the facts in dispute and the evidence before the Court and viewing the facts in a light most favorable to the Plaintiff, a reasonable jury could conclude that the Defendants acted in reckless indifference to the Plaintiff's right under the Fourth Amendment to be free from an unreasonable seizure. Accordingly, the Court will deny the Defendants' request for summary judgment on the Plaintiff's claim for punitive damages.

## CONCLUSION

For the reasons stated above, the Court DENIES the United States of America's Motion for Summary Judgment [ECF No. 61], and DENIES Defendants Sergeant Joel C. Squadrito, Sergeant Gregory L. Stier, Detective Matthew Harrison, Officer Eric M. Thompson, and the City of Fort Wayne's Motion for Summary Judgment [ECF No. 63]. A telephonic status/scheduling conference is set for November 28, 2012, at 11:00 AM Eastern time before Judge Theresa L. Springmann. The Court will initiate the call.

SO ORDERED on October 23, 2012.

 s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT